We'll hear argument first this morning in Case 10-945, Florence v. Board of Chosen Freeholders of the County of Burlington. Mr. Goldstein. Mr. Chief Justice, may it please the Court. We ask this Court to hold that a jail may strip search and arrestee in cases of reasonable suspicion. That is the rule that was applied throughout almost the entire country in the three decades after Bell v. Wolfish, without either administrative difficulty or any apparent increase in smuggling. We're here today, of course, because both the Burlington Jail and the Essex County Jail require every arrestee to stand two feet in front of a correctional officer and strip naked. Do you apply the reasonable suspicion rule to all arrestees? I thought you were making a distinction between felons and less serious offenders. We do apply it to all arrestees. The Respondents in the U.S. Bureau of Prisons do draw a line at major versus minor offenders. I think they do that because they think that people who commit more serious crimes might be inclined to greater criminality. But our rule is one of reasonable suspicion. Our question presented draws a line at minor offenders because this class definition is only people who were arrested for minor offenses. Kennedy is the reasonable suspicion test more easily met if it's a felon detained for a serious felony? It is, in the view of the courts that have considered this question, absolutely in our view, yes. In your view? Yes. And in fact, how we've Well, then you are going on a case-by-case basis based on the offense. The categorical rule, and that was adopted by these Respondents, by the Bureau of Prisons and four courts of appeals, that says if you were arrested for a more serious offense, categorically there exists reasonable suspicion. Our case-by-case rule, it's true, applies with respect to minor offenders. And again, that's the class that was developed. Well, how would this work with respect to individuals who have been arrested for serious offenses? Let's say someone has been arrested for assault. Let's say it's a case of domestic violence assault. Would that be enough to justify search? I think you will have to ask — I know you want me to answer the question. Let me just be very clear. This is their rule. The Respondents draw the major-minor offense line. The Respondents apply a reasonable suspicion standard. Now, in my view Well, I understand. You say that you don't want to draw that line. You want to apply it to everybody. And I'm asking you whether the mere fact that someone has been arrested for a violent offense would, in your judgment, be sufficient to provide reasonable suspicion. If the jail made that judgment, we would think that a court would not overturn that judgment. We think that illustrates that, by contrast, when someone is arrested for not paying a fine, that there is no justification whatsoever, because the logic of their own policy is that this is a person who is inclined to violence. But I take it what we're trying to do is to protect the individual dignity of the detainee. But it seems to me that you risk compromising that individual dignity if you say, we have reasonable suspicion as to you, but not as to you. You're just setting us up. And you're setting the detainee up for a classification that may be questioned at the time and will be seen as an affront based on the person's race, based on what he said or she said to the officers coming in. So it seems to me that your rule imperils individual dignity in a way that the blanket rule does not. Well, a couple of points, Justice Kennedy. I think it's an incredibly important issue. They don't have a blanket rule. Remember, the Respondents apply a reasonable suspicion standard. They do strip everyone naked, but if they're going to look for contraband, that is, look at the person's mouth, look at their anus, they apply a reasonable suspicion standard. Now, to your very serious concern that maybe we are inviting discrimination or at least an appearance of discrimination, remember that their rule is going to produce more of that problem than ours, because their rule is not that they have to strip search everyone for contraband, but their rule is they can. They can make a choice. This Court in the Fourth, right, they say we don't have to. Well, I'm not sure if it's their rule or our rule. Ultimately, it's going to be our rule. Yes. Okay. Well, then, let me say I hope not. I hope that your rule is that there has to be a reasonable suspicion standard, which is the rule that was applied almost everywhere in the wake of Bell v. Wolfish without. To do what? You just said it's strip naked, it's different from a strip search. Yes, exactly. So what is permitted? I mean, there are various things. One is showering in the presence of officers? Showering in the presence of officers is not something that requires reasonable suspicion. The courts have uniformly concluded that if you are just generally in an area in which you are being monitored by the officers, that's not a Fourth Amendment search that violates a reasonable expectation of privacy. This is different. They can be inspected without their clothes, just any more than that. There are two different scenarios. One is a common room where everyone is standing around and for jail security purposes they have a common room, a common shower area, and of course for security purposes. This is different, Justice Ginsburg. You asked what's prohibited in the absence of reasonable suspicion. What's prohibited is standing 2 feet away from the person. Now, I want to know what's permitted. Yes. What is permitted is anything what is not subject to a reasonable suspicion standard is anything other than looking at a close inspection of the person at arm's length. What the courts of appeals have uniformly recognized in the lower Federal courts, what the literature recognizes. And really what I think concerned this Court in the Safford case is that when you are standing so close to the person inspecting their genitals, looking directly at their most private parts of their bodies, that is a direct intrusion on their individual privacy. Sotomayor, are you suggesting, look at the three different levels, stripping naked, it's okay to stand 5 feet away but not 2? I don't think that the courts have had to confront 5 feet versus 2 feet. What they have confronted is they acknowledge that jails are places that require security. And so if you are just observing a shower room, that does not implicate a reasonable  Sotomayor, are you taking the position that it's the purpose of the search that's at issue? No. It's the closeness of it. There is not a problem, I think, with a question of 2, 3, 4, or 5 feet. These searches all occur in the same way, and that is the officer stands directly in front of you. The testimony here is 2 feet away. This seems to be the common 3-part. I'm still unsure if it's okay to shower. Yes. And have an officer watch you shower naked. Yes. What is the greater intrusion is that you are standing 2 as opposed to 5 feet away? 2 versus 10 feet away or just generally observing the room. This is exactly what you would report. All right. If that's a line that doesn't make much sense to me, let's go to the next line, which is that's one kind of search. The second is I think what some have called a visual cavity search, whether you are able to open or expose private parts. Yes. Can you make an argument that that's different than just a visual search? You can. So let me just say, let me just try and close off my answer to the question of the 5 versus 10 feet and then turn immediately to this visual body cavity search. Remember, this is the Court will recall that this is a reprise of the argument in the Safford case where the schools there argued that, well, there's an observation of these students in gym class, they shower together naked, they undress naked, and the Court said it's quite different when you're standing right there looking over the student, and said that's what implicates a Fourth Amendment right of privacy and the distinction did make sense. As to your question, yes, there is a material difference, we think, although we think both should be covered by our rule, but a visual body cavity inspection, as occurred in the Essex facility here, where you require someone to bend over and cough, which is what the testimony is in this case, is it one, not the other. That's correct. The second jail had a slightly different search protocol in which the testimony is that he was required to bend over and cough and expose his anus for inspection. And the Respondents themselves regard that as a more significant intrusion, and they apply a reasonable suspicion standard themselves to that. Scalia. I understand what you propose is reasonable enough, I suppose, and some States could adopt that kind of a protocol instead of what they have, but what you're asserting is that the Fourth Amendment prohibits them from adopting it. And the obstacle I see is that at the time the Fourth Amendment was adopted, this was standard practice to strip search people who were admitted to prisons. So how could it be deemed an unreasonable invasion of privacy when it was done all the time and nobody thought it was unconstitutional? We don't believe that the premise is correct. If you read the history differently than me, I'm not going to be able to persuade you. But our understanding of the history is that the closest they can come to is two things. First, that people were strip searched upon arrest, and that's certainly not the rule under the Fourth Amendment. And that in certain jails at the time of the founding, other inmates in a process of abolition would, as an almost kind of ritual cleansing, would strip search new inmates. It had nothing to do with the jail officials themselves or trying to intercept contraband. That is somehow less of an intrusion on your privacy, to be naked in front of a whole bunch of inmates rather than one jail official inspecting? Well, first, it wasn't a nearly uniform practice that I think your question assumes. And it's just a different kettle of fish entirely. That we don't believe, obviously, that that historical lesson obtains today, that the prisoners can strip search new inmates as they — new arrestees as they come in. I do agree with the basic premise of your question, that it's — our position can't just be that, hey, I've got a reasonable rule. I do have to, in either under the terms of Bell v. Wolfish or Turner v. Safley, establish that this is an exaggerated response, that this is much more, materially more than is necessary to accomplish their goals.  bit more than is necessary to accomplish their goals. But that's intrusive than the one in the search in Bell v. Wolfish, which involved pretrial detainees. No, Justice Ginsburg, we disagree with that. At least as to the second search, we think that there's no difference between the degree of intrusion here and in Bell. But there is another significant reason that this — not just in the nature of the search, but a big difference between this case and Bell is that the inmates in that case made a voluntary choice. They decided to have the contact visits that was going to be used. Do we know if the pretrial detainees in Bell were also inspected on entry into the facility? We do not. I tried everything I could to check the record of that case, and there was no record of an admission strip search at the MCC at the time. Counsel, is there — there's a distinction between the simple strip search and the visual body cavity search. You say that they apply reasonable suspicion standard to the visual body cavity search. Yes. So is the visual body cavity search therefore off the table? No, it is not. We contend that the Fourth Amendment prohibited the visual body cavity search at the Essex facility. So — Right, right. But you would say that they had to have a reasonable articulable suspicion before they could do that. We say that under their written policy they should have, but they didn't. The Burlington County — the only evidence about a conclusion of the jail about reasonable suspicion is that the Burlington County intake officer filled out a form saying there is no reasonable suspicion here. And Essex, I don't believe, contends that there was reasonable suspicion to engage in a visual body cavity search. They deny, as a matter of fact, that it happened. So you see a distinction between what they actually do and the written policy? I do with respect to the Essex. Well, I apologize. No. What happened here is that Essex, after this search occurred, and this is described in the Essex brief in opposition, in case you want to look at it later, at 3 and note 1, Essex, after the search in this case, changed its policy. We were denied an injunction going forward under L.A. v. Lyon. So we — it's just a question of damages for the search that occurred at the time under their old policy. I'm confused about your position. Suppose a jurisdiction has the policy of requiring every inmate who is arrested and is going to be held in custody to disrobe and take a shower and apply medication for the prevention of the spread of lice and is observed while this is taking place from some distance by a corrections officer, let's say 10 feet away. Is that — does that require reasonable suspicion? It does not. And so your only concern is searches that go further than that. That's exactly right. The very close inspection of the individual's genitals, which can occur absolutely so long as there is some minimal level of suspicion that's created. I do want to return to Justice Kennedy's concern about dignitary interests here and whether drawing any— Mr. —could I just follow up on that? Is there a dispute of fact as to whether anything beyond that occurred in Burlington County? In Burlington County, there is a dispute about the so-called genital lift, whether Mr. Florence was required to lift his genitals or not. There is no dispute that he was required directly in front of an officer to strip naked, despite the officer having made a finding, which is in page 390 of the Joint Appendix, that there was no reasonable suspicion to conduct a strip search. That is the only factual dispute in the entire case. Sotomayor, could you clarify two points for me? The first is, was he admitted into the general population at Burlington? The record is not entirely clear. What the record says is that for the first few days of his stay, remember he inexplicably was kept for six days. For the first several days, he was kept in a cell with only one other inmate or possibly two, and one time he had lunch with other people. In Essex, he was admitted to the general population. Sotomayor, the prior charge against your client was the use of the deadly weapon. Assuming the prison knew this, wouldn't that provide the reasonable suspicion that you argue was missing? No, because it depends on the breadth of the phrase, possession of a deadly weapon, as this case illustrates. The record shows that the possession of the deadly weapon, and that's why this charge was not pursued by the State, was that he was pulled over at a traffic stop and he drove away. The deadly weapon is the car. Sotomayor, you're feeding into your adversary's arguments that what you're asking the police to do on intake or the corrections facility on intake is to investigate in that fine detail. They can't even look at the rap sheet, the use of a deadly weapon, and say, ah, this guy could be dangerous? No, Justice Sotomayor, the rap sheet does not contain that charge. What the rap sheet does show, and we are perfectly fine with them looking at the rap sheet, the rap sheet, and it's in the Joint Appendix, the rap sheet says he had a single charge, he pleaded guilty, he got a term of probation. There is nothing about that the jail would have had any information suggesting that he had some charge involving a deadly weapon, and that's why they themselves certified that there was no reasonable suspicion. Kennedy, is the rap sheet always available immediately? I thought it was rather common, correct me if I'm wrong, based on practice some years ago, that it would take maybe 24 hours, 48 hours for the wire tap, for the wire services and the Internet to report that he was wanted for questioning for some very, very serious crime in some other State. I mean, in my practice, at least, county jails were much more dangerous than penitentiaries because you don't know who these people are. You arrest them for traffic, and it may be some serial killer. You do not know. First, that is not the view of the jails in this case. Remember, they apply a reasonable suspicion standard. They did not find any concern in their own policies, neither does the Marshal Service, ICE, with this prospect of some prior offense. As to what the rule is and how common it is and whether this works in practice, the jail here did look him up in the New Jersey Criminal Justice Information System. That's in the record. They were required by New Jersey law to do that. It's a — every single one of these jails has computer access to the NJ, CJIS, and also to the NCIC. They just type in his identifying information. They were able to pull him up without any difficulty, and they have not complained that they didn't have enough information about him. They filled out a form saying there is no reasonable suspicion here. And remember, our rule only operates in a system, Justice Kennedy, in which the jail does have enough information. When our point is this, if the jail has the facts, as it did here, to affirmatively determine that there is no reasonable suspicion, which is what they decided about, Mr. Florence, then it is an extraordinary intrusion on dignity and autonomy to strip him naked when they have no reason to do so. Roberts. Roberts. My understanding of the statistics, and correct me if I'm wrong, is that they get about 70 new people going through this process a day. Is there anything in the record about how much additional time it would require to look at each one, to look at their record, to determine which category they should fall into to strip search or not, as opposed to having a blanket rule? Sure. There is, because they do this already. They — it is not an administrative problem. They apply our rule today. Remember, Mr. Chief Justice, when he arrived at the Burlington County Jail, they did an assessment of him and determined that there was no reasonable suspicion. The jails in this case did pull up his prior criminal history, and they have no problem doing that. They apply our standard today. It is not a difficult one. Remember? Mr. Goldstein, you have acknowledged that we have held that when you have visitors, you may be strip searched after the visit and the same kind of close examination that you object to here. Now, your explanation why that is okay is that that is voluntary. I have two explanations. That you don't have to have visitors. Can you really condition your having visitors on your waiver of your Fourth Amendment rights? Yes. Block establishes that you have no right whatsoever to have contact visits. And so under Schnecklock v. Bustamante, of course, you can say, I voluntarily relinquish my Fourth Amendment right in exchange for this privilege. But I have a second. Are you sure about that? You can condition certain privileges upon a waiver of constitutional privileges? Yes. I believe that that's — I think that's a fair statement of the law. I do have a second point, though, and that is that the principal reason underlying Bell v. Wolfish's holding that those searches were reasonable is that it was essential to deter smuggling. And that deterrence rationale has much more of an attenuated relationship to this case. Remember that the inmate in that case was having a planned meeting with someone. And the representation of the government is that our problem is if you plan to have somebody come visit you and you're going to have a contact visit, you can plan for them to try and sneak something to you. This Court has set a — Mr. Goldstein, there, of course, were guards there who were watching the visits. And as I understand that case, there was really no empirical evidence that smuggling came about as a result of these visits. Well, could I just read to you what the Court said about that, just so — the Court did have a slightly different take, I think, and this is from page 559 of the Court's opinion. That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on this person may be more a testament to the effectiveness of the search technique as a deterrent than to any lack of interest on the part of the inmate to secrete and import such items when the opportunity arises. And our point is that that, when you have an unexpected arrest here, remember Mr. Florence, showed the paperwork that he was not wanted for arrest, and that's going to be generally true in all kinds of traffic stops and the like. Now, that would be— Breyer, which is it you're doing? I mean, imagine — I thought you were saying you always need reasonable suspicion. So I imagine a case where the person is going to be arrested, put into the general prison population, there is a warrant out against him for second-degree murder, and the policeman stopping him for a traffic offense arrests him because he knows he's wanted on a warrant in another place, and the jail has a policy that says when you come in here because of second-degree murder, we strip search you, okay? Can they do that under your rule or not? That's all they know. Yes. And you do not want it. Then you are not saying it always has to be reasonable suspicion. It's just a debate about words. We think that is reasonable suspicion. All right. Well, that isn't helping me. I'm sorry. What helps me is to know what the category of things is that the jail, in your opinion, is going to have to look into the characteristics of this individual person. And when I look at the ABA, they talk about minor arrests. And when I look at some of the cases, there is a long list like violence, drugs, and so forth, where you don't have to, where you can just use general fact that he was arrested for the thing. But there are other ones, minor ones, where you do. So what's your rule on that? Our rule that we would accept is that with respect to minor offenders, that's when you assess the individual. Okay. Then the next question which we'll get, who is a minor offender and how do you administer that rule? Okay. I think that is a great question for them because that's their rule. They have a rule that says for minor offenders that you have to have reasonable suspicion. But you are trying to state the constitutional rule, and you keep talking about what is their rule, and we're trying to find out what are the limits of the rule. And I think you've already qualified what you said opening. Opening, you said reasonable suspicion is the rule for everyone, the felon as well as the minor offenders. Now you seem to be saying, well, this case involves only minor offenders, so let's limit it to that. That's what I thought you were saying there. Yes. That's right. Because this case only involves minor offenders, we have articulated a rule with respect to minor offenders. Now, that's what I'm unfortunately I'm asking you and not them. And it's the same question. Sure. How do you want us to write this so that jail personnel all over the country have to be able to follow it and know exactly what they're supposed to do? For three decades, the rule that was articulated by the Federal courts and applied without difficulty is one that says four minor offenses. When that was applied in practice, it was basically done at a felony versus misdemeanor line. The Court accepted that if you are the Court's accepted that if you are suspected of a more serious offense, then for administrative reasons and because we just think you might be engaged in more criminality, then you don't have to have any individualized inquiry whatsoever. I can understand that for cavity searches, but why for the search to see if the person has any fleas or cooties or, you know, any other communicable disease before he's put into the general population? Are felons more likely to have those than nonfelons? No, they are not. So that line makes no sense for that aspect of the search, which is just we want to make sure that we have a clean prison. That is not correct. That aspect, what the testimony in this case establishes is that the jail guards allow any sort of medical rationale for the search to be conducted by medical personnel, not by the guards themselves. All these inmates are examined by a medical person, a nurse or the like, and they are responsible for that. Scalia. And that's where the Fourth Amendment invasion of privacy line is to be drawn. If you're examined close up by someone who has a medical degree, it's okay. And on the other hand, if it's someone who does not have a medical degree, it's not okay. That is true. But it can't be the line as to whether your privacy is being invaded. It can be the line, and it is the line that's been accepted for decades. You would have to keep the person in custody, say, for 24, 48 hours, until the medical personnel could come. Do you have 24-hour medical personnel for intakes that are due in the morning? Yes. The intake process, the testimony is that there are not. You're telling us that every county jail in the United States has medical personnel on duty 24 hours a day, ready to do a search? No. I apologize, Justice Kennedy. I'm telling you what's in the record in this case, and that is. What you said before was 2 feet is too close, but 5 feet is okay. Are you sticking with that? Justice Breyer, I'm saying that a close inspection, which is intended to examine the person's individual genitals, and whether it's at 2 feet or 4 feet, I don't think is the relevant line. If I could make one point and then reserve the remainder of my time. May I just ask, in your medical personnel, children in school get inspected for head lice, prisoners for body lice. You don't need a doctor to do that. No, that's right. But if that is right, what happens is that medical professionals are the people who are assigned that responsibility. That's the testimony in this case. The only last point that I wanted to make is that. But that's not constitutionally required. I agree. So that's another thing that you don't need to do. They can inspect for body lice, and that's okay. If that's what they're doing, I think that that is okay. The courts have said that that is not itself a, because of the prospect of handling that problem with shampoo, which is what these jails do, that that's not a sufficient justification to require the person to strip naked. The only other point that I did want to make is that this is the rule not just of Burlington and Essex, but also of the U.S. Marshal Service, which has the intake of 220,000 inmates every year, and also of the Bureau of Immigration Customs Enforcement, which intakes 384,000. Ginsburg. But the government tells us that that's true only if they don't put the arrestee in the general population. That's not correct. That is only the policy of the U.S. Bureau of Prisons, which has an intake of minor offenders of only a few thousand people a year. For the Marshal Service and for ICE, which have a combined 600,000 people every year, they do not have that separate housing rule, if I could reserve the right. Roberts. Roberts. But we'll give you rebuttal time, but maybe just to be clear, you don't do you or do you not have an objection to the superseding ECCF policy? We, if the we do, because they still have to stand naked directly in front of the correctional officer under the superseding policy. What the superseding policy is, which is Burlington's policy throughout this, is that they will not search the person for contraband, which is their supposed interest here, for contraband, in the absence of reasonable suspicion. Both jails at the time of this search and also now will still require the person to strip naked, supposedly for contraband, even though their own policy says we won't search for the we won't engage in the depth of search that's required. We won't look at the anus. We won't look at the person's mouth in the absence of reasonable suspicion. That's the current policy. That is the current policy. And you have no problem with that? We do have. I mean, you have no problem with the reasonable articulable suspicion aspect of the body cavity search? That's correct. Okay. And with respect to the simple strip search? Yes. Your only objection is that the guard is too close to the inmate? That's right. Okay. Thank you. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court, I actually appreciate the clarification that your questions brought to this case, because I think there's a bit of confusion that I'd like to try to clear up, although my colleague's movement in terms of answering some of the questions left me a little bit perplexed as to exactly what the nature of their claims are. The first question that it seems to me the Court should focus on is what policy is at issue here? And obviously, since the class certification deals with one set of issues and the plaintiff's claims deal with another set of issues, I think you have to be careful. I think you have to focus on the policies that existed in 2005. That was the basis on which he was, in fact, searched under these circumstances. And the policy in Burlington was that it was primarily aimed, frankly, at health and tattoos, and the policy at Essex was aimed primarily at contraband and then secondarily at tattoos and health. And the policy at Burlington was largely a, you come into prison, you give up your clothes, they look through your clothes, you take a shower, they examine you fairly cursorily but look at you, and then give you prison garb and move along your way. Roberts. I'm sorry, is the shower and look at you cursorily, are those separate things, or is it during the shower? It's before or during. Your friend places a lot of significance on how close the examination is. So under that policy, how close was the examination? Almost certainly would have been about an arm's length, because at that — I mean, the problem is if you're exchanging clothes with somebody, you're handing them clothes to change into, it's sort of hard to be longer than arm's length and actually get the clothes into his hands. So that's the — Four arm's lengths. I mean, he could beat you out, right? Okay. Two arm's lengths. Well, that's not right. They could take — But I'm not — That's not right. You could take the clothes off, put them in a bin, and the person examines the bin. Right. And that's actually what they do in Essex. In Essex, they do it that way. The difference between Essex is that Essex, in fact, does have — part of the problem is terminological. I mean, Burlington is basically a body visual observation, and the district court said that's unconstitutional, that just observing at all is unconstitutional. To some extent, it seems to me my friend here has given up that part of the district court's decision, which then clearly the court of appeals, to the extent it reversed that part, ought to be affirmed on that ground alone. For more than 2 feet or less than 2 feet. Right. Although, that was not the district court's theory. The district court didn't say 2 feet. What happened, do we know? I mean, his — Within 2 feet or not within 2 feet? Well, it depends on whose version of it. We don't know. You have to remember, the district court granted summary judgment to the plaintiff in this case. So you would have to — you would have to interpret — you'd have to give us the benefit of the interpretation, which was that it was more than 2 feet. But the court of appeals reversed, of course, without regard to that, because the court of appeals said, look, if you apply this Court's decision in Bell v. Wolfish, it doesn't matter, because you can engage in a much more intrusive true body cavity search, which frankly is more intrusive than even what Essex County asks — does in this case. Because he wasn't asked to bend over and to — and to have a body cavity anal search. What he was asked to do was to squat and cough in the event that — because ordinarily that will cause the contraband then to fall out, and you can — and you can catch it under those circumstances. So this is — that's sort of the context in which this issue comes up. But, Mr. Phillips, if I could understand your position, you think that there's no reasonable suspicion even for that more intrusive body cavity search, is that right? That's correct. That's my — that's the rule of law in this case. And does it matter to you whether the person is being introduced into the general prison population, or would you also say that if the person is not being introduced to the — into the general prison population, do you still think that there's no reasonable suspicion requirement? I would say, from my perspective, I think even — even if they weren't going to be admitted into the general prison population, because the risks remain too substantial. But the truth is, I don't have to defend that argument, because both of — both of these jails admit the — their inmates into the — into the general population 99.9 percent of the time. So that's not a line we draw. Would you say that regardless of the offense for which the person is arrested? There have been some stories in the news recently about cities that have taken to arresting people for traffic citations. So suppose someone is just arrested because they have a lot of tickets for, you know, being caught on speed cameras, let's say. That person can be subjected to the searches that you're describing? Yes, Justice Alito. I think the basic principle we're asking for is that the deference to the jails and — and to the administrators of the jails requires that this Court respect their judgment that you can't make a distinction based on that specific individual, that — that whether somebody is a minor offender or a major offender, one is never all that clear in the first place, and two, isn't a basis on which to distinguish the risks that it poses to the — Try the ABA. The ABA is — is minor offenses, not drugs, not violence. And there you have to have reasonable suspicion. Now, I've read through the briefs, and I can't find a lot of contrabanders that were caught in that category. In fact, my law clerk thinks it's one out of 64,000 or less. So what is the justification for a rule to avoid reasonable suspicion in that category? If you look at the expert testimony that was before the Court in the district court in this case, both the expert testimony of the plaintiff and the expert testimony of the defendant, this is at 348A of the Joint Appendix. It says a greater presence of contraband amongst those individuals that have minor offenses. That's his — that's their expert's characterization, that minor offenders bring in more contraband than major offenders. Our expert said misdemeanors can be more dangerous and more likely to bring in contraband. Breyer. And we have a lot of practical experience, because different States have different rules, and San Francisco came in with, I think, the toughest on your side, for your side. I would just say, looking through that, it's very hard to find somebody who really was in this minor offender category who really was found to have contraband. So what should I look at to show that my initial reaction from a quick reading is wrong? Well, I mean, I think you can go back to Bell v. Wolfish, where this Court said that the fact that there is not a lot of contraband being found may be a testament to the effectiveness of the deterrence. Sotomayor So why do we change the policy? In Bell, we found that the policy was successful. Even though there was searches, contraband still got in. So virtually every circuit, in practice, the Federal system, have been following this reasonable suspicion for minor crimes, and they've been fairly successful. So why do we change the constitutional rule to let them do more? Well, I think that I don't know. Sotomayor To invade more. Well, I mean, I think, first of all, anybody who thinks that the problems of contraband are less serious today than they were in 1978 is ignoring reality. Sotomayor I understand contraband is serious, but most of the studies point to it not being on intake, but coming in through guards, coming in through contact visits. The great cause today is that from corrupt correction officials. Well, I mean, we can debate that, but, Justice Sotomayor, it seems to me that the fundamental principle that ought to undergird the entirety of the Court's analysis here comes out of Turner v. Safley and that line of cases where Sotomayor Could I ask you something just in terms of your rule? I think your brief says your rule is you're not entitled constitutionally to any right of privacy in prison. If that's the case, are you saying that if the prisons decide on a manual search, every prisoner who comes in, correction officers can manually check their cavities? No, Justice Sotomayor. Is that? So there is some privacy right. I can be clear about this. It seems to me that Hudson v. Palmer and the history of the Fourth Amendment clearly suggest that there is no reasonable expectation of privacy being viewed naked in a prison. And therefore, the ordinary Burlington approach of having somebody take a shower and looking at him or her naked for tattoos and health and the incidental contraband, clearly constitutional, clearly doesn't even raise a Fourth Amendment issue. When you get beyond that point and start to begin the what Essex does, which is not a true anal cavity search, but simply an anal-focused and genital-focused search, I think that is subject to the Turner v. Safley and or the Bell v. Wolfie  Sotomayor, can we go back to Justice Alito's question? Isn't one of the factors that we look at under the Fourth Amendment reasonableness? And should we be thinking about the fact that many of these people who are now being arrested are being put into general populations or into jails, sometimes not just overnight, but for longer periods of time, like this gentleman, for six days, before he sees a magistrate? Should we be considering a rule that basically says your right to search someone depends on whether that individual has, in fact, been arrested for a crime that's not related to jail time or not, whether that person's been presented to a magistrate to see whether there is, in fact, probable cause for the arrest and detention of this individual? I mean, there is something unsettling about permitting the police to arrest people for things like kids who are staying out after curfew with no other basic right, nothing else. I think what is disturbing about this case is, in fact, that he was arrested under circumstances in which he candidly shouldn't have been arrested as a matter of State law. I understand that. But I think to change the constitutional rule and to change the Turner v. Safley and Bell v. Wolfish standards and ignore what the underlying inquiry should be here, which is these policies, which apply across the board, impinge constitutional protections, but nevertheless represent the good faith judgment of our jailers. But what are we doing with the presumption of innocence? That's also a constitutional right, and so shouldn't the degree to which a search is permitted be conditioned in some way on whether or not this person has been presented to a magistrate? If you ask me the way I would analyze it, if you want to adopt a different set of standards about who ought to be arrested and who ought to be taken to jail, that's fine. I understand that. But I think once you're talking about actually bringing someone into the jail to be admitted into the general population in what is, without question, one of the most dangerous, most risky environments, in that context, I would hope that this Court, rather than asking individual jailers to make decisions on the basis where they clearly will not have the kind of information you're asking them to make, and where if they make a judgment wrong in either direction, all it means is litigation. Either they do it or they don't. Roberts. I thought your friend said that is exactly what you do with respect to the visual body cavity search, reasonable articulable suspicion under the new policy. That's what we do with a true anal body cavity search. What we do, I mean, we change the policy, to be sure. Roberts. We change the policy because of litigation concerns. Roberts. Well, now, as I understand it, with respect to visual body cavity searches, you require a particular individual reason, right? Yes. Okay. And you don't require that with respect to simple strip search. Right. Okay. So you agree with your friend that the only thing at issue here is how close the guard is going to be to the individual who you have no reasonable suspicion to think is different than anybody else during a simple strip search. You want to go to 2 feet, you don't want to have to stand back to 6 feet. That's all the case comes down to? I don't think, well, I mean, you can characterize it that way. I mean, I think the better way to think about it is that what Essex wants, what Essex policy permitted it to do was to examine the misfortune. I'm not interested in what Essex policy permitted it to do in the past. I'm looking at the new policy, all right? Under the new policy, you have reasonable articulable suspicion for everything except simple strip search and observation. Well, see, that's the problem, is that the language there is different, because the truth is that the line that the new policy draws is between a true, what I think Bell v. Wolfish was describing, where you ask the inmate to bend over and expose his or her anus for a cavity search. On that score, that's what we don't do that. But we do, in fact, ask the inmate to bend over and expose his or her anus for a cavity   search. We don't ask the individual to lift his genitals and to squat and cough. Okay. So you do more than a simple strip search. Right. Slightly more than a simple strip search. But I don't think that's the line to draw anywhere. There is still an issue in the case beyond the ordinary visual inspection, and that is this. Even though you have changed your policy now, the question remains whether that change in policy was constitutionally required, so that when you treated the plaintiff in a different fashion under the old policy, that was a violation of the Constitution. Doesn't that question remain in the case? That question clearly remains in the case. Okay. So there are two questions. So you have to consider both the pure visual and also the inspection for contraband. Right. And all I'm going to say, the only point I've been trying to make here is that if you look at the way the district court analyzed the case, the district court split it up, and it's the basis of the class distinction versus individual. Does the record or common experience justify an argument that if you have the person who stopped just for a traffic ticket, but that person is going to be in custody for 5 or 6 days, that person might well prefer an institution where everyone has been searched before he or she is put into the population with them? Justice Kennedy, there actually is testimony on the record from the warden saying that in order to ensure everybody's safety, we are better off with a blanket policy that says that we're going to engage in some form of the search. Essex has a slightly more intrusive one. But it is all designed to accomplish the same thing. It's not just designed to ensure against contraband and that. It's designed to ensure that there isn't somebody like Mr. Florence who's going to end up being poked or otherwise. Breyer. Is there any evidence? There are, I count, 7 or 8 States anyway that have some variation of the reasonable suspicion rule like what they want, roughly. Is there any evidence at all that in those 7 or 8 States there is more contraband being smuggled in? Well, there is a testimony in the record from their expert who said that in Kentucky, there is today the single biggest problem in Kentucky prisons and the biggest cause of death is drug overdose, which suggests that there's a serious contraband issue in Kentucky. Kentucky is in one of those, is one of those, is inside one of the circuits. It's had a reasonable suspicion requirement as a constitutional matter forever. So I would say there, yes, there is some evidence from which you could infer that it's worse now than it was. But I would also ask the Court to rely on its common sense and its own, and what it essentially took judicial notice of in Bell v. Wolfish and Rutherford v. Block, which is this is a serious problem and it is no less a serious problem today than it was more than 30 years ago. Are there any limits, are there any constitutional limits in your view? You say you didn't attempt the kind of search that was done in Dalvey Wood, Wolfish. Is there any constitutional impediment to your doing so? I don't believe that. My position would be no, there isn't a constitutional impediment. The balance would tip in favor of the institution under those circumstances. I do think, obviously, there is a limit between a manual physical body cavity search. And that, it seems to me, yes, that would be a very different balance of the equation. And I suspect I would be very hard-pressed to convince five members of this Court that that's the principle. Scalia, would you like to write an opinion that applies only to squatting and coughing? Is that it? Well, you may want to write it slightly differently, Justice Scalia. But what I would really like is an opinion that recognizes that deference to the prison and to their judgment is what's appropriate under these circumstances, and that extends all the way to the Bell v. Wolfish line. The only difference being that I would like for the Court to analyze it under Turner v. Safley, in which the analysis is, is this, you know, is there a logical nexus between the rule that the prisons have and preventing a problem, and the answer is yes, and are there reasonable alternatives, and there the answer is no. You are saying that they can do the full, as far as the Constitution is concerned, all of these searches are permissible. Clearly, all of our searches are permissible. And I would go as Bell v. Wolfish. I think that's exactly the holding of Bell v. Wolfish. Bell v. Wolfish was not tied in its opinion itself to the fact that they did. They did stress that there was a visitor who could give the inmate contraband. Bell v. Wolfish doesn't, and I asked Mr. Goldstein whether we know whether pretrial detainees in New York were searched that way on entry, and he said there's nothing that shows one way or the other. Right. I think that's correct. We don't know. And of course, part of the empirical problem in that is that that facility had only been open for 4 months anyway, so it was really going to be difficult if you were going to adopt the policy that they had adopted in Bell to insist on some sort of empirical proof. But you can't Kagan But one significant difference between Bell and this case is that in Bell there was a real opportunity for people to plan, to conspire together to bring in contraband. Here you're talking about somebody who's arrested on the spot. There's no opportunity for planning, for conspiracy with respect to contraband, is there? No, but the policy itself, may I answer the question? The policy is aimed at all people, not just at Mr. Florence. And if you aim it at all people, there are people who self-report, who've obviously got an opportunity to bring in contraband, and there are a lot of people who just get arrested and happen to have drugs or something on them, and rather than show those when they're being stopped for a speeding ticket, will likely stick it in their pocket or put it somewhere else. Thank you, Your Honor. Thank you, counsel. Ms. Zaharsky. Mr. Chief Justice, and may it please the Court, the searches at issue in Bell are very similar to the searches at issue in this case, and they should be upheld. I want to start with Justice Kagan's question. It is true that contact visits in Bell are different from a person coming into the jail for the first time, in that there might be a greater opportunity for planning. But as one of the justices pointed out, there was less of an opportunity to actually get contraband. The person coming in was going to be searched. The inmate, as Justice Marshall pointed out, was wearing a one-piece zip-up jumper, and he's being watched the entire time. The visit the contraband situation in this case, at intake, the person does have an opportunity, even if they are not self-reporting, knowing that they're going to be arrested. Protesters, for example, who decide deliberately to get arrested, they might be stopped by the police, they see the squad car behind them, they might have a gun or contraband in their car and think, hey, I'm going to put that on my person, I just need to get it somewhere, that's not going to be found during a pat-down search, and then potentially they have the contraband with them. Also, the process of going from the arrest, point of arrest, to the general jail population is not a quick one. The person typically goes, for example, to a metropolitan police department, that's what happens here, and the person would mix potentially there in a holding cell with other offenders. If this Court, for example, adopted a rule saying that minor offenders would not be searched in a way that other offenders would, I have no doubt that there are some offenders in those circumstances all on the bus together to go to the general jail population who would give the stuff to the minor offenders in order to get them to bring it in. Ginsburg-Miller, then how does that differ if that's not the Federal rule? And, by the way, the brief was really confusing, because when I read page 1, page 1 tells me that the BOP policy requires all incoming pretrial detainees to be subject to visual body cavity inspections. And then it isn't until page 30 that I learned there is an exception for the very category of arrestee that we're talking about here, that they are not subject to body cavity inspections unless there's reasonable suspicion that they're concealing contraband, that the misdemeanor or civil contempt offender is not subject. I'm sorry if that was confusing. The Bureau of Prisons policy is that a person will not be put in the general population being allowed to mix with other offenders unless he or she has undergone the strip search. Ginsburg-Miller, but I want to know how people in this category are treated in the Federal system, and you reversed it. They, they, those people are not subject to this visual body cavity search. Those people, when they go into the jail, would be asked whether they're willing to consent to this type of search. In most cases, they do consent. If they don't consent and there is not reasonable suspicion, then they are not placed in the general jail population. They are kept separate from the other offenders. So it is the case, the rule that the Third Circuit identified, which is a blanket policy, that anyone that's going to go into the general jail population and mix with everyone else has to be strip searched. That is the Federal Bureau of Prisons policy. I just know that. Roberts, I'm sorry, I'm sure I missed something. You say when they go in, they're asked, will you consent to a more intrusive body cavity search and be put into the general population, or if you don't, you don't have to be searched and we put you in someplace else. Who, who consents to that? Well, the, the general jail population has certain facilities, you know, computer facilities and others that you don't get when you're in a cell by yourselves. As a practical matter, this arises very, very infrequently in the Federal system. We're talking about fewer than 1 percent of offenders. And the question before the Court at this point really is, you have before you a blanket policy saying we need to strip search everyone, and is that something that's unreasonable or irrational in the way that the Court has considered its normal deference to prison  And I just would like to say to you, Justice Sotomayor, I understand most of the general proposition that your side is advancing, but I, I have to say I, I was somewhat surprised at the evidence of the amount of contraband that was discovered, the amount of weapons that were discovered that's in the literature and that's in the citations were, was somewhat skimpy. I, I, I thought there would be a stronger showing than I, than I found in the, in the briefs. Well, there, there are not empirical studies of this type of information. Typically, it arises when there are incidents at a facility and incident reports are written up. They're not published regularly. There's not some kind of laboratory study that you can do. The facilities have an incident they try to deal with. Sometimes it makes the news. Those are the, some of the things that we've reported. And I would hate for the Court to think that there is not evidence of people who've committed minor offenders in the record bringing in very serious things into prisons and jails. I'd point you to footnote 15 in the government's brief, which talks about people being arrested for traffic offenses and smuggling crack pipes in body cavities. I'd point the Court to both experts in this case cited by Mr. Phillips. I'd point the Court to the record in full, the San Francisco case. Sotomayor The issue has to be certainly some misdemeanor, some people charged with misdemeanor crimes will try to smuggle things in. The issue is how many of them would not have been found on a reasonable suspicion standard. I think Justice Breyer said in the San Francisco study it appears only one. I think that that's a very hazardous thing for courts to do with 20-20 hindsight. You know, the Court could look back at individual offenders and find that information. Sotomayor But we don't have 20-20. We have how many years, 15 years since Bell? Where prisons have been applying the reasonable suspicion standard, and the most you can muster under that standard is one example of a case where someone has entered. At some point, empirical evidence has to mean something in terms of us judging the question of reasonableness. I agree with you, but what I'm saying is that the individuals who are doing the searches at issue have very limited information about people. This is when you have people who are coming into the first the system for the first time. They have had the most contact with the outside world. You have the least amount of information about them. In the Federal system, you don't know.  But I have a question about that today. I know that it's bad to base your judgments on your own personal experiences. When I was a prosecutor, it took sometimes days to get a rap sheet. I understand that that's no longer the case today, that they're virtually almost always accessible by computers today? That may be true, but it's not the information that the people who do intake and are doing the searches have. They do not have that information at their fingertips in the Federal system. They have name, date of birth, and they have the offense that the person was charged with. They don't know anything else. And the question before the Court, if I may, is whether there are reasons for a blanket rule that this Court should defer to. And I would say there are several. First of all, you cannot say that there are some minor offenders that don't pose a contraband risk. They are documented in the record. Second, you have individuals who are making very quick determinations. They have a large number of people to get through into the general prison population. They have very little time, and if they guess wrong, those mistakes can be deadly. So the rule needs to be deferred. Alito, suppose we accept the Petitioner's concession that it is permissible to require everybody who is arrested to disrobe and shower under the observation of a corrections officer from a certain distance. Now the question would become, how many people who do that will still be able to smuggle in contraband? Saharsky. Well, there would be contraband found that would be in body cavities, and we have documented in this record and other records in our brief that there are folks who do that, and that contraband is not found until they do the sliding copper feature. Breyer. That's my problem, why I don't know. I overstated the strength of your evidence. I was just trying to throw it out. I understated it. San Francisco's point is really that 30 to 60 percent or some very high percentage of people who come in for minor crimes are high on drugs or have been the – and there is just that footnote really which has a few examples, definitely they are there, in this category. So would it be helpful if you included in the excluded part people who are high on drugs? You see, so we give you the high on drugs people. It's the drug offense and those who are high on drugs and those – I mean, is there a way of drawing this rule that we can even catch most of the people in footnotes who do that? I think the fundamental question for the Court is who is supposed to be doing this line drawing. And you've said in case after case after case, you're going to defer to the prison and jail officials who are seeing this stuff on the count day to day. Breyer. But it's obvious that the simplest thing for any prison official is say do it for everybody. And so the fact they do it for everybody and don't try to make some exclusion for traffic violators or something might be consistent with little or no evidence and might be consistent with some. That's why I keep looking. There are many good reasons, though, to have a policy to do it for everyone. It is easy to administer when you have lots of people. It is done for the protection of people, like Petitioner. We don't want to be nice to each other. If there's so much sense to that policy, why isn't it the Federal policy? Before, you said because there aren't that many offenders. If there were more, then would there be – would the Federal policy change so that even people who are in on a contempt charge or a minor crime? Yes. The Federal government thinks that that blanket policy is a good one. It made one modification to its policy in 2003 when the weight of the circuits was against it. But, again, this is a policy that is done for everyone's protection. A point that Justice Kennedy made earlier is that there's no – I'm sorry, I didn't understand. You think the Fed thinks it's a good policy to inspect everyone? Yes, to inspect everyone who would be put in the general jail population. That is the Third Circuit's holding, and that's what we're defending in this case. That's because when you have a rule that treats everyone the same, you don't have folks that are singled out, you don't have any security gaps. We urge you to affirm the judgment of the Court below. Thank you, counsel. Mr. Goldstein, you take 4 minutes. Thank you, sir. I have three points to make. The first is that my friend from the United States says defer to the experts. But the point that the United States consistently omits is that there are 600,000 offenders that go into the Federal system every year. I don't understand the claim that this only involves 1 percent of Federal offenders. The Marshal Service and ICE admit 600,000 offenders every year under our standard. They are not kept in separate housing. These are cited in our brief. 600,000 people, is their expert judgment, are subject to a reasonable suspicion standard when they're admitted to jail. The second point about numbers, Justice Breyer, there is a significant empirical study, and that is the County of Orange case. The district judge there did an unbelievably detailed job going through the record of 26,000 admissions into the system and was able to identify only a single instance where contraband would have gotten in under a reasonable suspicion standard. There is also evidence in this case, and it is the evidence, to my surprise, that my friends keep pointing to. There's a memorandum from the Essex jail system. It's at page 70A to 71A of the Joint Appendix. And it tells you two really relevant things. It says every year they admit 25,175 people into this jail, and that they only found 14 instances of contraband. And they don't even make the claim that those 14 instances out of 25,000 would not have been found under a reasonable suspicion standard. So you have evidence in this record about this particular case. Third, a couple of points have been made about whether, Justice Breyer, you asked whether someone who is high on drugs. The uniform rule, and this is not just the ABA, but the expert standard of the American Correctional Association, what they say is that essentially almost anything will do. What will not amount to reasonable suspicion is when you have a minor offender and we do have 700,000 people in jail in the United States every year for misdemeanor offenses. This is a lot of people who are having a very significant intrusion on privacy. And the expert standard, the rule that was applied under Bell v. Wolfish is that when you have people who come in on a minor offense, they don't have any drug history. They are not high on drugs. There was no opportunity to hide a weapon. I'm not sure where they think the gun is going to be hidden that's not going to show up in the very close manual pat-down that they do of every one of these people that isn't going to show up in. Alito I don't think you are really arguing for an individualized reasonable suspicion standard. I think you are arguing for a rule that draws distinctions based on categories that correspond only perhaps very roughly to reasonable suspicion. Goldstein Well, first, there are real categories that are over-inclusive in favor of the jails, like if it's a serious offense or they have any drug history. And then on top of that, if there's any individualized basis that the jails can articulate, that will do as well. We are not saying that categorically people will be excluded from being searched. We are saying that there are entire categories that will automatically be searchable. We are just saying don't throw the baby out with the bathwater. When somebody is pulled over like Mr. Florence, and there's just — it's laugh-out-loud funny to think that he's smuggling something into this jail, that it's too much of an intrusion to put him under the direct, you know, two feet away, I'm going to look at your genitals, as opposed to the ordinary intrusion of saying we're going to oversee the showers. There is no evidence when it comes to that group of people, and there are a lot of them, that they represent anything like a material threat of smuggling. And this is a very significant intrusion on individual privacy and individual dignity. Thank you. Thank you, counsel. The case is submitted.